**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

FÉLIX LAHENS,

     Plaintiff,

        v.                    CIVIL NO.: 18-1776 (MEL)

AT&T MOBILITY PUERTO RICO, INC., et al.

     Defendant.

**OPINION AND ORDER**

     Mr. Félix Lahens ("Plaintiff") filed a complaint against AT&T Mobility Puerto Rico, Inc. ("Defendant or AT&T Mobility") and AT&T, Inc. on October 16, 2018.[1] ECF No. 1. In his complaint, Plaintiff alleges that he was discriminated against because of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et. seq., and Title 29, Annotated Laws of Puerto Rico, Section 146 ("Law 100"). It is also alleged by Plaintiff that he was discriminated against because of his disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et. seq., and Title 1, Annotated Laws of Puerto Rico, Section 501 ("Law 44"). Additionally, Plaintiff claims that he suffered damages due to retaliatory conduct and seeks relief under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. 2000e et. seq., and Title 29, Annotated Laws of Puerto Rico, Section 194 ("Law 115"). Plaintiff further claims that he was terminated from employment without "just cause" in violation of Title 29, Annotated Laws of Puerto Rico, Section 185a ("Law 80"). Lastly, it is contended by Plaintiff that he suffered damages as the result of illegal discrimination and

---

[1] The claims against AT&T, Inc. were dismissed. See ECF No. 27.

retaliation and seeks relief under Title 31, Annotated Laws of Puerto Rico, Section 5141 ("Article 1802").

Pending before the court is Defendant's motion for summary judgment. ECF No. 46. Defendant argues, inter alia, in its motion for summary judgment that Plaintiff "suffered no actionable age or disability discrimination or retaliation." Id. at 36. Plaintiff responded in opposition on March 4, 2020. ECF Nos. 60, 61. Defendant subsequently filed a reply on April 9, 2020. ECF Nos. 67, 68. On April 22, 2020, a surreply was filed by Plaintiff. ECF No. 76.

## I.    Standard of Review

The purpose of summary judgment "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992) (citations omitted). Summary judgment is granted when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it has the potential of determining the outcome of the litigation." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Rodríguez-Rivera v. Federico Trilla Reg'l Hosp., 532 F.3d 28, 30 (1st Cir. 2008)).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant presents a properly focused motion "averring 'an absence of evidence to support the nonmoving party's case[,]' [t]he burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).

For issues where the nonmoving party bears the ultimate burden of proof, the party cannot merely "rely on an absence of competent evidence, but must affirmatively point to specific facts [in the record] that demonstrate the existence of an authentic dispute." McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995) (citation omitted). The party need not, however, "rely only on *uncontradicted* evidence . . . . So long as the [party]'s evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (emphasis in original) (citation omitted).

In assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan, 904 F.2d at 115. There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood." Greenburg v. P. R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). The court may, however, safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

## II.     Plaintiff's Affidavit in Support of his Opposition to the Motion for Summary Judgment

In support of his motion in opposition to Defendant's motion for summary judgment, Plaintiff submitted an unsworn declaration under penalty of perjury. See ECF No. 61-1. Defendant argues that Plaintiff's unsworn declaration is a "sham affidavit" because it includes "previously undisclosed allegations" and some of his declaration statements are inconsistent with his deposition testimony. ECF No. 67, at 4-6. Thus, Defendant asks that the court strike

Plaintiff's unsworn declaration from the record and not consider it in evaluating the motion for summary judgment. Id.

A party is permitted to submit an affidavit in opposition to a motion for summary judgment so long as it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). However, "where a party has given 'clear answers to unambiguous questions' in discovery, that party cannot 'create a conflict and resist summary judgment with an affidavit that is clearly contradictory,' unless there is a 'satisfactory explanation of why the testimony has changed.'" Escribano-Reyes v. Prof'l Hepa Certificate Corp., 817 F.3d 380, 386 (1st Cir. 2016) (quoting Hernández–Loring v. Universidad Metropolitana, 233 F.3d 49, 54 (1st Cir. 2000)).

Here, Defendant identifies six specific statements in Plaintiff's unsworn declaration that it claims are new and being alleged for the first time. ECF No. 67, at 4-5. Defendant does not explain how these "new" statements contradict Plaintiff's deposition testimony or record evidence. It is also claimed by Defendant that some of Plaintiff's declaration statements are inconsistent with his deposition testimony. Thus, Defendant contends that the court should strike 31 of Plaintiff's objections to Defendant's proposed facts which are supported by his declaration statements. Id. at 6. Defendant, however, fails to identify the specific statements in Plaintiff's declaration that it claims are inconsistent with the record evidence. Furthermore, Defendant did not produce Plaintiff's corresponding deposition testimony for each "inconsistent" declaration statement in order for the court to evaluate its claims. Accordingly, Plaintiff's unsworn declaration will be considered in evaluating Defendant's motion for summary judgment. Defendant's reply statement of uncontested facts will also be considered. ECF No. 68. The court

reminds the parties, however, that it "is not obliged to accept as true or to deem as a disputed

material fact, each and every unsupported, subjective, conclusory, or imaginative statement made

to the court by a party." Torrech-Hernández v. General Elec. Co., 519 F.3d 41, 47 (1st Cir.

2008).

## III.    Uncontested Material Facts

### A. General Information About the Parties

Plaintiff was born in 1955 and as of the filing of the motion for summary judgment was

64 years old. ECF No. 47, at 2, ¶ 4; ECF No. 61, at 1, ¶ 4. Defendant, AT&T Mobility, is

engaged in the sale of telecommunication services and equipment throughout Puerto Rico. ECF

No. 47, at 1, ¶ 1; ECF No. 61, at 1, ¶ 1. DIRECTV is the leading satellite television provider in

Puerto Rico. ECF No. 47, at 1, ¶ 2; ECF No. 61, at 1, ¶ 2. Plaintiff started working for

DIRECTV on March 4, 2013. ECF No. 47, at 2, ¶ 6; ECF No. 61, at 1, ¶ 6. In May 2014,

DIRECTV entered into a merger agreement with AT&T, Inc. in which DIRECTV became a

wholly owned subsidiary of AT&T, Inc. ECF No. 47, at 1, ¶ 3; ECF No. 61, at 1, ¶ 3. After the

merger agreement between DIRECTV and AT&T Inc., Defendant became an employee of

AT&T Mobility.[2] ECF No. 1, at 3, ¶ 5; ECF No. 12, at 2, ¶ 5.

### B. Corporate Policies and Procedures

As an AT&T Mobility employee, Plaintiff was required to comply with the ethical

standards and core values set forth in "AT&T's"[3] Code of Business Conduct (the "COBC"). ECF

No. 47, at 3, ¶ 16; ECF No. 61, at 2, ¶ 16. The COBC contains the ethical standards that AT&T

---

[2] Defendant has provided no information regarding the corporate relationship, if any, that exists between AT&T Mobility and DIRECTV. Defendant has also not explained the corporate relationship, if any, that exists between AT&T Mobility and AT&T, Inc. Furthermore, Defendant claims at all times that Plaintiff was an employee of AT&T Mobility even though he was a Sales Training Manager at DIRECTV. This contention, however, has never been disputed by Plaintiff in the complaint or in the response to the motion for summary judgment.
[3] "AT&T" was never defined by Defendant and it is unclear if it is used to refer to AT&T Mobility, AT&T, Inc., or both. Plaintiff, however, does not contest that the COBC applies to AT&T Mobility.

Mobility expects from all of its employees in the performance of their duties. One purpose of the COBC is to prevent employee conduct that could expose AT&T Mobility and its employees to liability. These liabilities include, but are not limited to, violations of federal and state laws, conflicts of interest, violations of "AT&T's" rules pertaining to ethical behavior, including unlawful discrimination and harassment, safety in the workplace, matters related to confidentiality of information, or any other conduct that may expose AT&T Mobility and its employees to legal liability from the government, other employees or customers. ECF No. 47, at 4, ¶ 17; ECF No. 61, at 2, ¶ 17.

In order to achieve this purpose, the COBC lists conduct that will not be tolerated, encourages employees to seek assistance when they have doubts about "AT&T's" policies and procedures, and requests that employees report any unethical or seemingly unethical behavior or policy violations involving any "AT&T" employee (including management). ECF No. 47, at 4, ¶ 18; ECF No. 61, at 2, ¶ 18. The COBC specifically prohibits discrimination and unlawful harassment on the basis of race, color, religion, national origin, gender, sexual orientation, gender identity, age, disability, marital status, citizenship status, military status, or veteran status. ECF No. 47, at 4, ¶ 19; ECF No. 61, at 2, ¶ 19. Based on the nature of the policies contained therein, violations to the COBC are penalized with disciplinary sanctions commensurate with the nature and severity of the violation. The COBC expressly warns employees that dismissal can occur even on a first violation. ECF No. 47, at 4, ¶ 20; ECF No. 61, at 2, ¶ 20.

As an AT&T Mobility employee, Plaintiff had an obligation under the COBC to treat his fellow co-workers and managers courteously and professionally. ECF No. 47, at 5, ¶ 21; ECF No. 61, at 2, ¶ 21. Over the course of his employment with AT&T Mobility, Plaintiff received annual training on the company's COBC. The last time he received training on "AT&T's"

COBC occurred on January 19, 2017. ECF No. 47, at 5, ¶ 22; ECF No. 61, at 3, ¶ 22. The COBC

provides several channels through which employees may ask questions or report unethical

behavior. The available channels include supervisors, any manager, Human Resources,

Corporate Compliance, Asset Protection, Corporate Ethics, or the Legal Department. Employees

may also make confidential and anonymous reports of suspected or actual violations of

"AT&T's" COBC or other "Company" policies through "AT&T's" Ethics Hotline. ECF No. 47,

at 5, ¶ 23; ECF No. 61, at 3, ¶ 23.

### C. Internal Complaints Against And By Plaintiff Prior to His Termination[4]

Plaintiff originally applied for a Training Specialist position at DIRECTV. Mr. Giancarlo

Capelli ("Mr. Capelli") applied for and competed with Plaintiff for the Training Specialist

position. However, based on his experience, Plaintiff was hired as Sales Training Manager, a

higher-ranking position with a higher salary and benefits and who supervised "DIRECTV's"

Training Specialists. Mr. Capelli was selected for the Training Specialist position as part of that

recruitment process. ECF No. 47, at 2, ¶ 7; ECF No. 47-3, at 2, ¶ 7.

Plaintiff worked as an exempt employee in a Sales Training Manager position within

DIRECTV's Product Marketing Management organization. In said capacity, Plaintiff was

classified as a level two manager and was mainly responsible for developing, administering,

organizing, and conducting employee training programs for DIRECTV's salesforce to increase

DIRECTV's sales in Puerto Rico. ECF No. 47, at 2-3, ¶ 10; ECF No. 61, at 2, ¶ 10. As an

---

[4] The following facts are deemed admitted despite Plaintiff's denial because the denial does not contradict the proposed facts: 7, 28, 52, 56, 58, 61, 62, 63, 65, 66, 67, 74, 77, 78, 79, 80, 82. ECF No. 47; ECF No. 61. Fact 40 is deemed admitted despite Plaintiff's denial because the denial is not supported by the record exhibits. Id. The following facts are deemed admitted despite Plaintiff's denial because the denial contains conclusory allegations: 31, 72, 85. Id. The facts in Defendant's reply to the motion for summary judgment (ECF No. 68, at 37-38) are deemed admitted to the extent that they are supported by their record citations because Plaintiff did not respond to these facts. See Local Rule 56(e).

exempt employee, Plaintiff was not required to record the number of hours he worked, nor was he required to clock-in or clock-out using a time clock or similar time-keeping device at the beginning or end of his workday. ECF No. 47, at 3, ¶ 11; ECF No. 61, at 2, ¶ 11. Plaintiff supervised two Training Specialists, Mr. Capelli and Mr. Wilfredo Lugo ("Mr. Lugo") who were both classified as level one managers. ECF No. 47, at 3, ¶ 12; ECF No. 47-2, at 20-21. Mr. Capelli was born in 1985. ECF No. 47, at 3, ¶ 13; ECF No. 61, at 2, ¶ 13. Mr. Lugo was born in 1967. ECF No. 47, at 3, ¶ 14; ECF No. 61, at 2, ¶ 14. Plaintiff's compensation and employee benefits were never reduced during his employment with "AT&T." Further, Plaintiff received periodic merit increases in compensation. ECF No. 47, at 3, ¶ 15; ECF No. 61, at 2, ¶ 15.

Plaintiff reported to Ms. Madeline Cuestas ("Ms. Cuestas"), Senior Sales Manager, from December 2013 until April 2015, when Ms. Cuestas resigned her position. ECF No. 47, at 5, ¶ 24; ECF No. 61, at 3, ¶ 24. As a result of Ms. Cuestas' resignation, Plaintiff temporarily reported directly to his second-level manager, Ms. Belkys Mata Mayor ("Ms. Mata"), Sales and Marketing Executive Director, from April to May 2015.[5] ECF No. 47, at 5, ¶ 25; ECF No. 47-1, at 2, ¶ 10. Ms. Mata was born in 1972 and as of the filing of the motion for summary judgment was 47 years old. ECF No. 47, at 6, ¶ 26; ECF No. 61, at 3, ¶ 26. Ms. Natcha Rodríguez Colón ("Ms. Rodríguez"), then "Senior Manager, Marketing BI and Planning," started supervising Plaintiff in May 2015. ECF No. 47, at 6, ¶ 27; ECF No. 61, at 3, ¶ 27. Ms. Rodríguez was born in 1969. ECF No. 47, at 6, ¶ 30; ECF No. 61, at 3, ¶ 30. The only period in which there was not a

---

[5] Plaintiff denies proposed fact number 25 and alleges that Ms. Mata's decision to directly supervise Plaintiff began in April 2015 and ended in April of 2016. ECF No. 61, at 3, ¶ 25. Plaintiff's claim is supported by his deposition testimony. See ECF No. 61-2, at 121-122. In its reply, Defendant alleges that after Plaintiff's deposition, "it was clarified that Plaintiff reported directly to [Ms. Mata] from April 2015 to May 2015 when [Ms. Rodríguez] started to supervise him directly. These dates were included in Defendant's SUF ¶ 27, which Plaintiff admitted." ECF No. 68, at 5. Indeed, Plaintiff's admittance of proposed fact number 27 contradicts his denial of proposed fact number 25. See ECF No. 47, at 6, ¶ 27; ECF No. 61, at 3, ¶ 27. Proposed fact number 25 is admitted.

manager or a director in between Ms. Mata's position and Plaintiff's Sales Training Manager position was from April 2015 to May 2015. ECF No. 47, at 6, ¶ 27; ECF No. 61, at 3, ¶ 27.

Ms. Mata held staff meetings with her direct reports. When employees in Ms. Mata's department were assigned to a special project, they were invited to attend the segment of the staff meeting where the assigned project would be discussed. From April 2015 to May 2015, while the supervisory position that existed between Ms. Mata and Plaintiff was vacant, Plaintiff reported directly to Ms. Mata and attended her staff meetings. ECF No. 47, at 6, ¶ 28; ECF No. 47-1, at 2, ¶ 11. Because Plaintiff no longer reported directly to Ms. Mata after Ms. Rodríguez became his supervisor in May 2015, Plaintiff was no longer an attendee at Ms. Mata's staff meetings. Also, Ms. Mata did not see a need for Plaintiff to participate considering that Ms. Rodríguez would attend these meetings and could provide any information that was needed regarding sales trainings. ECF No. 47, at 6-7, ¶ 31; ECF No. 47-1, at 3, ¶ 12. In December 2016, Ms. Rodríguez was offered, and she accepted, a new position titled Senior Sales Program Executive Manager. As such, she continued to supervise Plaintiff. ECF No. 47, at 6, ¶ 29; ECF No. 61, at 3, ¶ 29.

In or around August 2015, Plaintiff learned that he needed a liver transplant. Consequently, he applied for medical leave under Puerto Rico's Non-Occupational Temporary Disability Benefits Act ("SINOT," its Spanish acronym). ECF No. 47, at 9, ¶ 40; ECF No. 47-2, at 15-16; ECF No. 47-3, at 3, ¶ 14. Plaintiff's SINOT leave application was approved on August 24, 2015 and was granted medical leave under SINOT from August 24, 2015 until August 30, 2016. ECF No. 47, at 9, ¶¶ 41, 42; ECF No. 61, at 5, ¶¶ 41, 42. Plaintiff began his SINOT leave on September 30, 2015. ECF No. 47, at 9, ¶ 43; ECF No. 61, at 5, ¶ 43. On January 29, 2016, Plaintiff underwent a liver transplant. ECF No. 47, at 9, ¶ 44; ECF No. 61, at 5, ¶ 44. While Plaintiff was on medical leave, he used all of his accrued sick days, which complemented the

disability benefits provided under SINOT, before he was reinstated in his position in April 2016. ECF No. 47, at 9, ¶ 45; ECF No. 61, at 5, ¶ 45.

DIRECTV has a voluntary program where exempt employees can donate up to five (5) accrued sick days to employees suffering from a catastrophic illness. ECF No. 47, at 9, ¶ 46; ECF No. 61, at 5, ¶ 46. On November 5, 2015, Ms. Elisa Pérez ("Ms. Pérez"), a member of DIRECTV's Human Resources Department, sent an email to those employees eligible to donate sick days informing them that there was an employee that was eligible to receive sick day contributions. ECF No. 47, at 10, ¶ 47; ECF No. 61, at 6, ¶ 47. As a result of this initiative, employees donated Plaintiff a total of ninety-eight (98) sick days. Mr. Capelli, Ms. Rodríguez, and Mrs. Ana Figueroa ("Mrs. Figueroa"), DIRECTV's Human Resources Director, donated some of their sick days to Plaintiff. The total donated sick days amount to $19,034.75. ECF No. 47, at 10, ¶ 48; ECF No. 61, at 6, ¶ 48.

In or around January 2016, DIRECTV's Sales Department implemented a special project known as Plan Calle. The objective of Plan Calle was to reach those areas in which DIRECTV had no retail locations through door-to-door sales. ECF No. 47, at 7, ¶ 33; ECF No. 61, at 4, ¶ 33. Mr. Capelli was assigned to lead Plan Calle in January 2016. As such, he would be responsible for coordinating Plan Calle's activities and providing updates directly to Ms. Mata, who supervised his performance as part of Plan Calle. During this temporary assignment, Mr. Capelli was released from his regular duties and responsibilities as Training Specialist. ECF No. 47, at 7, ¶ 34; ECF No. 61, at 4, ¶ 34. Mr. Capelli's temporary assignment to the Plan Calle special project was unrelated to his functions as Training Specialist. ECF No. 47, at 7, ¶ 35; ECF No. 61, at 4, ¶ 35. Plaintiff did not supervise Mr. Capelli while he was assigned to Plan Calle and Plaintiff did not participate in this project. ECF No. 47, at 7, ¶ 36; ECF No. 61, at 4, ¶ 36.

Mr. Capelli's participation in Plan Calle ended in or around June 2016. ECF No. 47, at 8, ¶ 38; ECF No. 61, at 4, ¶ 38.

On April 4, 2016, Plaintiff was reinstated in his Sales Training Manager position upon returning from his medical leave of absence. Plaintiff's compensation, benefits and other terms and conditions of employment remained unchanged. ECF No. 47, at 10, ¶ 49; ECF No. 47-2, at 17-19; ECF No. 47-3, at 3, ¶ 15. Whether he also continued directly supervising Mr. Capelli and Mr. Lugo, however, is in dispute. ECF No. 61, at 2, ¶ 12; ECF No. 61, at 6, ¶ 49; ECF No. 61-1, at 6, ¶ 16-17. On July 26, 2016, Plaintiff submitted a request for accommodation and a completed medical questionnaire. Plaintiff's accommodation request consisted of time off to attend medical appointments and checkups related to his liver transplant. ECF No. 47, at 10, ¶ 50; ECF No. 61, at 6, ¶ 50. On July 27, 2016, Ms. Bárbara Bravo ("Ms. Bravo"), DIRECTV's Human Resources Business Partner, sent Plaintiff a letter in response to his request for accommodation informing Plaintiff that he did not need an accommodation because he could perform all the essential functions of his position without it. ECF No. 47, at 10-11, ¶ 51; ECF No. 61, at 6, ¶ 51.

As an exempt employee, Plaintiff had the flexibility of accommodating his work schedule to attend medical appointments and checkups without previous authorization. He also enjoyed the flexibility of determining his daily and weekly work schedule." ECF No. 47, at 11, ¶ 52; ECF No. 47-2, at 23-25; ECF No. 47-3, at 4, ¶ 21. Plaintiff was never disciplined for violating any attendance rules or policies. ECF No. 47, at 11, ¶ 53; ECF No. 61, at 6, ¶ 53.

In or around December 2016, Plaintiff presented to Ms. Mata and Ms. Rodríguez a program he titled "Compass" which he believed would improve the current training program for DIRECTV's salesforce. ECF No. 47, at 11, ¶ 55; ECF No. 61, at 7, ¶ 55. On January 9, 2017,

Plaintiff held a meeting with Mr. Capelli and Mr. Lugo to discuss the 2017 sales training plans, which included a discussion of his Compass program. During the meeting, Mr. Capelli and Mr. Lugo declined to endorse the Compass program. ECF No. 47, at 11-12, ¶ 56; ECF No. 47-2, at 39-45.

Mr. Capelli filed an internal complaint on January 11, 2017 related to Plaintiff's conduct in the January 9, 2017 meeting. ECF No. 47, at 12, ¶ 58; ECF No. 47-3, at 6, ¶ 30; ECF No. 47-4, at 2, ¶ 10; ECF No. 47-2, at 47. AT&T Mobility's Human Resources Department investigated Mr. Capelli's complaint. The investigation was conducted by Ms. Verónica Sánchez ("Ms. Sánchez"), Regional Performance Manager. ECF No. 47, at 12, ¶ 59; ECF No. 61, at 9, ¶ 59. On February 14, 2017, Mr. Capelli and Mr. Lugo were interviewed as part of the investigation. After each of their interviews, they signed a transcript of the questions that were asked to them and their responses to the same. ECF No. 47, at 12, ¶ 60; ECF No. 61, at 9, ¶ 60.

As stated in his interview transcript, Mr. Capelli explained that during the January 9, 2017 meeting, he and Mr. Lugo told Plaintiff that they did not feel comfortable having their names added to the Compass program presentation because they did not participate in its design or development. Mr. Capelli also stated that Plaintiff expressed his anger and displeasure at them for telling Ms. Rodríguez that they had not participated in Plaintiff's initiative because it demonstrated a lack of team spirit. Nevertheless, Mr. Capelli stated that both he and Mr. Lugo informed Plaintiff that if the project was approved, they would both get on board and support it. According to Mr. Capelli, [Plaintiff] then "closed his laptop in an abrupt manner . . . got up acting very upset . . . [and] kept saying that he was going to get the 'fuck' out of the room." ECF No. 47, at 12-13, ¶ 61; ECF No. 47-3, at 6-7, ¶ 34; ECF No. 47-3, at 36-37. At the end of his interview, Mr. Capelli informed the investigator that, although he did not want the investigation

to go further, he did want the statements to be recorded. Mr. Capelli stated that he was not comfortable with Plaintiff's behavior during the meeting and that he would not allow it. ECF No. 47, at 13, ¶ 62; ECF No. 47-3, at 7, ¶ 35; ECF No. 47-3, at 37.

During his interview, Mr. Lugo explained that after he and Mr. Capelli told Plaintiff that they did not understand why Plaintiff wanted to include their names in the Compass program presentation because they had not worked on the program with him and had not contributed any ideas, Plaintiff "flipped out." In the report, Mr. Lugo explained, "When I say he flipped, he slammed his laptop very hard. I thought he broke the keyboard. He said a bad word, but I don't remember exactly what he said. He did curse in Spanish. He got very angry and lost control." ECF No. 47, at 13, ¶ 63; ECF No. 47-3, at 7, ¶ 36; ECF No. 47-3, at 39.

On February 23, 2017, Plaintiff was interviewed by Ms. Sánchez as part of the investigation related to Mr. Capelli's internal complaint. At the end of the interview, Plaintiff signed a transcript of the questions that were asked and his responses to the same. He did not include any comments in the interview transcript. ECF No. 47, at 13, ¶ 64; ECF No. 61, at 10, ¶ 64. During his interview, Plaintiff stated that after Mr. Capelli and Mr. Lugo declined to include their names in the proposed presentation of the Compass program, the meeting "got heated," and then he closed his laptop and left the meeting but stated that he did not recall what he said while leaving. Nevertheless, Plaintiff admitted that he "got a little excited" and that he confronted Mr. Capelli in an "excited tone, but not aggressive" after his direct reports stated that they would not include their names in the presentation of the program. ECF No. 47, at 14, ¶ 65; ECF No. 47-3, at 8, ¶ 38; ECF No. 47-2, at 49-54, at 109-112; ECF No. 47-3, at 45-46.

After reviewing the findings of the investigation conducted by "AT&T's" Human Resources Department, Ms. Rodríguez issued a written warning to Plaintiff on March 10, 2017

due to his unprofessional behavior during the January 9 meeting with Mr. Capelli and Mr. Lugo. Ms. Rodríguez asked Plaintiff to read, sign, and return the written warning. Plaintiff refused to sign the written warning. ECF No. 47, at 14, ¶ 66; ECF No. 47-4, at 2-3, ¶ 12; ECF No. 47-2, at 55-58. The written warning issued to Plaintiff on March 10, 2017 did not adversely impact Plaintiff's compensation, benefits, or any other term or condition of employment. ECF No. 47, at 14, ¶ 67; ECF No. 47-3, at 8, ¶ 41.

On March 15, 2017, Plaintiff sent an e-mail communication to Mr. Ángel Rijos ("Mr. Rijos"), Senior Lead Investigator of "AT&T's" Asset Protection Department, voicing his concerns about the legality of including competitors' logos, ads, and promotional materials in DIRECTV's sales training models. ECF No. 47, at 14-15, ¶ 68; ECF No. 61, at 13, ¶ 68. On March 21, 2017, Plaintiff filed an internal complaint against Ms. Rodríguez alleging that she had retaliated against him for voicing his concerns about the legality of including competitors' logos, ads, and promotional materials in DIRECTV's sales training materials. He also alleged that Ms. Rodríguez issued him a written warning on March 10, 2017 because of his age and disability. ECF No. 47, at 15, ¶ 69; ECF No. 61, at 13, ¶ 69.

AT&T Mobility's Human Resources Department opened an investigation into the internal complaint Plaintiff filed on March 21, 2017. The investigation was conducted by Ms. Sandra Moreno ("Ms. Moreno"), "AT&T Lead Consultant-EEO" from San Antonio, Texas, who did not know Plaintiff. ECF No. 47, at 15, ¶ 70; ECF No. 61, at 13 ¶ 70. On March 24, 2017, Ms. Moreno interviewed Plaintiff via telephone regarding his internal complaint. Generally, Plaintiff complained about how he felt underappreciated in his position after returning from his liver transplant, that he had been denied a reasonable accommodation after his liver transplant consisting of allowing him time off to attend medical exams and checkups, and that he

felt he had been unjustly issued a written warning in retaliation for complaining of possible copyright law violations in DIRECTV's training materials. ECF No. 47, at 15, ¶ 71; ECF No. 61, at 13, ¶ 71.

Upon concluding its investigation, AT&T Mobility's Human Resources Department concluded that Plaintiff had not been disciplined as a result of illegal discrimination or retaliation. Instead, the investigation showed that Plaintiff was disciplined on March 10, 2017 for becoming disruptive during a business meeting and using profanity as he left the meeting. Further, the investigation concluded that "AT&T's" Human Resources Department recommended that Plaintiff be placed on a written warning on March 10, 2017 as a result of his unprofessional behavior. For these reasons, Ms. Moreno concluded that there was no evidence to substantiate the allegations raised by Plaintiff in his internal complaint from March 21, 2017. Ms. Moreno communicated the results of her investigation to Plaintiff on May 18, 2017. ECF No. 47, at 15-16, ¶ 72; ECF No. 47-3, at 9-10, ¶ 46; ECF No. 47-2, at 63-65.

On or around May 25, 2017, Plaintiff requested a meeting with Mr. José Juan Dávila ("Mr. Dávila"), Vice-President, and General Manager of AT&T Mobility, via e-mail to discuss some matters related to his professional career. ECF No. 47, at 16, ¶ 73; ECF No. 61, at 14, ¶ 73. Plaintiff met with Mr. Dávila on May 30, 2017. In that meeting, Plaintiff stated that based on his previous work experience, Plaintiff understood that he deserved a special and/or higher-ranking position. Mr. Dávila explained to Plaintiff that within AT&T Mobility, the markets do not have flexibility to create special positions and encouraged Plaintiff to apply for any vacant positions across different business areas within Puerto Rico, as well as outside Puerto Rico, which were posted on "AT&T's" internal employment website. ECF No. 47, at 16, ¶ 74; ECF No. 47-5, at 1-

2, ¶¶ 4-7; ECF No. 47-2, at 65-68. In the meeting, Plaintiff did not discuss with Mr. Dávila any of his discrimination or retaliation complaints. ECF No. 47, at 16, ¶ 75; ECF No. 61, at 15, ¶ 75.

**D. AT&T's Reorganization and Plaintiff's Termination**

Beginning in 2016, "AT&T" underwent a restructuring of its operations nationally and in Puerto Rico to integrate AT&T Mobility's and DIRECTV's operations. Prior to the integration, DIRECTV had retained the services of London Consulting to do an efficiency assessment of its operations. ECF No. 68-1, at 1, ¶ 4. In October and November 2015, London Consulting recommended a reorganization of DIRECTV's structure and the elimination of various positions which would result in cost reductions. ECF No. 68, at 37, ¶ 1; ECF No. 68-1, at 1, ¶¶ 4, 6. One of the positions recommended for elimination was the Sales Training Manager. Id.; ECF No. 68-2.

This process included a three-part reduction in force to handle the resulting employee surplus, the lower volume of sales experienced as a result of the removal of prepaid DIRECTV services, and the consolidation of "AT&T's" and DIRECTV's retail locations. ECF No. 47, at 17, ¶ 76; ECF No. 47-1, at 4, ¶ 19. The first reduction in force occurred in January 2016 where positions were eliminated from DIRECTV's Marketing Department. ECF No. 68, at 2, ¶ 7.

After the integration of AT&T Mobility's and DIRECTV's operations, AT&T Mobility's Retail Sales Consultants would sell DIRECTV services in addition to continuing to sell AT&T Mobility's products and services. As a result of this decision, "AT&T" decided that there was no longer a need for an independent direct sales salesforce to sell DIRECTV's services at distinct points of sale or door-to-door at the prospective client's home or office. Consequently, "AT&T" implemented a second reduction in force which resulted in the elimination of DIRECTV's salesforce positions in Puerto Rico which became effective in December 2016. With the elimination of DIRECTV's salesforce positions, there was no longer a need to develop, organize

16

or coordinate training programs exclusively prepared for increasing DIRECTV sales in Puerto Rico. ECF No. 47, at 17-18, ¶ 79; ECF No. 47-1, at 4-5, ¶ 22; ECF No. 68, at 2, ¶ 7.

Further, at the time of integration, AT&T Mobility already had an internal training team responsible for developing, coordinating and providing sales training programs to its salesforce. This training team would now train AT&T Mobility's salesforce about DIRECTV's services, which would simply be added to the existing sales training programs provided to AT&T's Mobility's salesforce. ECF No. 47, at 18, ¶ 80; ECF No. 47-1, at 5, ¶ 23.

As part of the restructuring of operations, AT&T Mobility designated a group of DIRECTV directors who, together with "AT&T Mobility's HR Business Partner," Ms. Militza Piñero ("Ms. Piñero"), would consider AT&T Mobility's post-integration needs to determine which positions within the DIRECTV operation would become redundant. ECF No. 47, at 17, ¶ 77; ECF No. 47-1, at 4, ¶ 20. The DIRECTV directors assigned to make this assessment as part of the mentioned restructuring process were members of the Decisional Unit: Ms. Ayme Román Garcia (DOB: 1972) ("Ms. Román"), Director, Customer Experience; Ms. Mata, then Director, Product Marketing and Management (DOB: 1972); and Ms. Brenda E. Ponte Hernández (DOB: 1978) ("Ms. Ponte"), Director Network Services; with the assistance of Ms. Piñero (DOB: 1951). ECF No. 47, at 17, ¶ 78; ECF No. 47-1, at 4, ¶ 21; ECF No. 47-3, at 11, ¶ 53.

In July 2017, the Decisional Unit adopted London Consulting's recommendations to eliminate the positions included in its efficiency assessment of operations for the third reduction in force. ECF No. 68, at 36, ¶ 95; ECF No. 68, at 37, ¶ 2; ECF No. 68-1, at 2-3, ¶¶ 4-9. The Decisional Unit also determined that the following positions were no longer justified within DIRECTV's structure and recommended their elimination (the ages of the affected employees are provided in parentheses): Associate Tech Network Services (39 years old); a Lead Marketing

Manager position (56 years old); Lead Public Relations Manager (44 years old); Post-Venta

Prepago Coordinator (40 years old); Sales Merchandise Supervisor (40 years old); and Trade

Marketing Specialist (39 years old). ECF No. 47, at 18-19, ¶ 82; ECF No. 47-1, at 5, ¶ 25.

On July 31, 2017, Plaintiff received a surplus notification letter which indicated that, as

part of a restructuring process, his position at AT&T Mobility was eliminated. In his surplus

notification letter, Plaintiff was notified, among other things, that his last day of employment

would be September 29, 2017 and that he could be eligible to receive severance benefits under

the applicable severance plan, if he signed and returned a General Release and Waiver. ECF No.

47, at 19, ¶ 83; ECF No. 61, at 16, ¶ 83.

On August 14, 2017, Plaintiff filed a second internal complaint in which he alleged that

the decision to terminate his employment was motivated by Ms. Mata's practice of excluding

him because of his age and disability. ECF No. 47, at 19, ¶ 84; ECF No. 61, at 17, ¶ 84. AT&T

Mobility's Human Resources Department investigated Plaintiff's August 14, 2017 internal

complaint. The investigation was conducted by Ms. Pérez who interviewed Plaintiff on August

30, 2017 about his second internal complaint. ECF No. 47, at 19, ¶ 85; ECF No. 47-3, at 10,

¶ 48.

On September 13, 2017, Ms. Pérez contacted Plaintiff to inform him that the

investigation had been completed. The investigation concluded that there was no evidence that

the elimination of Plaintiff's position was motivated by his age, but rather that surplus decisions

were made based on position elimination, not age or any other protected category. ECF No. 47,

at 19-20, ¶ 86; ECF No. 61, at 17, ¶ 86. Due to the aftermath of Hurricane María in Puerto Rico,

Plaintiff, as well as other employees that were impacted by the reduction in force in Puerto Rico,

were informed that their last day of employment at AT&T Mobility was extended from

September 29, 2017 until December 30, 2017, and that they would continue to receive their full salary and benefits until said date, regardless of whether they reported to work or not. ECF No. 47, at 20, ¶ 87; ECF No. 61, at 17, ¶ 87.

Plaintiff temporarily relocated to the State of Florida in or around October 2017. ECF No. 47, at 20, ¶ 88; ECF No. 61, at 18, ¶ 88. Plaintiff did not perform any work for "AT&T" after the passing of Hurricane María on September 20, 2017. ECF No. 47, at 20, ¶ 89; ECF No. 61, at 18, ¶ 89. "AT&T" continued paying Plaintiff his full compensation and benefits until December 30, 2017, when his termination of employment became effective. From September 30 to December 29, 2017, "AT&T" paid Plaintiff $14,850.00 in compensation without performing any work. ECF No. 47, at 20, ¶ 90; ECF No. 61, at 18 ¶ 90. Plaintiff rejected AT&T Mobility's severance benefits offer from July 31, 2017. ECF No. 47, at 20, ¶ 91; ECF No. 61, at 18, ¶ 91.

On March 27, 2018, Plaintiff filed an administrative charge before the Antidiscrimination Unit of the Puerto Rico Department of Labor and Human Resources ("Puerto Rico ADU") alleging age discrimination under the ADEA and disability discrimination under the ADA under the Charge No. UADAU18-110c; 16H-2018-00199C (the "administrative charge"). ECF No. 47, at 20-21, ¶ 92; ECF No. 61, at 18, ¶ 92. According to the allegations included in the administrative charge, Plaintiff avers that the earliest discrimination act took place on April 4, 2016, when Plaintiff was reinstated after his liver transplant, and the latest occurred on December 29, 2017. ECF No. 47, at 21, ¶ 93; ECF No. 61, at 18, ¶ 93. Plaintiff did not check the "continuing violation" box in the administrative charge. ECF No. 47, at 21, ¶ 94; ECF No. 61, at 18, ¶ 94.

Mr. Capelli occupied the Training Specialist position until February 28, 2019. On March 1, 2019 he was transferred to the "Senior Training Mgr/Instructor position." The Senior Training

Mgr/Instructor position is not the same position that Plaintiff occupied as Sales Training Manager and it does not have supervisory responsibilities. ECF No. 68, at 38, ¶ 4; ECF No. 68-1, at 3, ¶ 12; ECF No. 68-4. Plaintiff does not cite to any evidence to suggest that the duties of Sales Training Manager and Senior Training Mgr/Instructor are the same.

## IV.    Legal Analysis

### A. Federal Law Claims

### 1. Time-Barred Federal Claims

"The ADA, ADEA and Title VII mandate 'compliance with the administrative procedures specified in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.'" Siaca v. Autoridad de Acueductos y Alcantarillados de Puerto Rico, 160 F. Supp. 2d 188, 194-95 (D.P.R. 2001); see Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 277 (1st Cir. 1999) (ADA claim); Alicea v. Ondeo De Puerto Rico, 389 F. Supp. 2d 269, 274 (D.P.R. 2005) (ADEA claim). "Title VII requires an employee to file an administrative charge as a prerequisite to commencing a civil action for employment discrimination." González v. Schenider Elec. Bldgs. Americas, Inc., Civ. No. 10-1876, 2011 WL 1311742, at *3 (D.P.R. 2011) (citing 42 U.S.C. § 2000e).

An aggrieved employee must file his charge with the Equal Employment Opportunity Commission "within 180 days of the alleged discriminatory conduct or within 300 days if 'the person aggrieved has initially instituted proceedings with a State or a local agency with authority to grant or seek relief from such practice." Martínez-Jordan v. Baxter Healthcare Corp., 608 F. Supp. 2d 224, 238 (D.P.R. 2009) (quoting 42 U.S.C. § 2000e–5(e)(1)); With respect to most charges of discrimination, Puerto Rico is a deferral jurisdiction in which the longer filing period applies." Rivera-Díaz v. Humana Ins. of Puerto Rico, Inc., 748 F.3d 387, 390 (1st Cir. 2014).

In the case at hand, Plaintiff filed an administrative charge with the Puerto Rico ADU on March 27, 2018. ECF No. 47, at 20-21, ¶ 92. Accordingly, Plaintiff's administrative charge was

timely filed for his ADA and ADEA claims arising from events that occurred on or after May 31, 2017 which is the beginning of the 300-day period. Defendant alleges that Plaintiff's ADEA and ADA claims arising from the following events predating May 31, 2017 are time-barred including his alleged exclusion from Ms. Mata's staff meetings, allegations that he was demoted in April 2016 because he no longer supervised Mr. Capelli and Mr. Lugo, the request for accommodation on July 26, 2016, the March 10, 2017 written warning, and any allegation related to the Sales Excellence Program. ECF No. 46, at 12.

Defendant also argues that these events cannot be considered actionable under a continuing violation theory. Id. at 12-13. Under the continuing violation doctrine, "a plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as a related act fell within the limitations period." Ayala v. Shinseki, 780 F.3d 52, 57 (1st Cir. 2015). "However, it is now well established that the doctrine does not apply to 'discrete acts' of alleged discrimination that occur on a 'particular day,' but only to discriminatory conduct that takes place 'over a series of days or perhaps years.'" Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009) (quoting National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002)). "The continuing violation doctrine simply 'allow[s] suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought.'" Ayala, 780 F.3d at 57 (quoting Morales–Tañón v. P.R. Elec. Power Auth., 524 F.3d 15, 19 (1st Cir. 2008)).

The Supreme Court has held that "[t]ermination, failure to promote, denial of transfer, [and] refusal to hire" constitute discrete acts which are instantaneously actionable. Morgan, 536 U.S. at 114. Furthermore, the First Circuit has found "that the denial of a reasonable accommodation, the failure to renew a contract, a change of supervisor, a relocation to another floor, a transfer to another office, and the failure to assign work to an employee also constitute

discrete acts." Ayala, 780 F.3d, at 57. "Similarly, a negative performance evaluation, transfer to another area, and letter of warning also constitute discrete acts." Id. "It is well-established that the statute is triggered upon the initial occurrence of the discrete adverse employment action, even if 'the effect of the employer's [actions] continues to be felt by the employee for as long as he remains employed.'" Id. at 57-58 (quoting Tobin, 553 F.3d at 132).

In the case at hand, Plaintiff's claim that he was discriminated against when he was allegedly demoted in April 2016 because he no longer supervised Mr. Capelli and Mr. Lugo is time-barred because a demotion constitutes a discrete act. ECF No. 60, at 6, 26; Radcliffe v. Securian Fin. Group, Inc., 906 F. Supp. 2d 874, 886, 889 (D. Minn. 2012) ("a demotion is considered a discrete act to which the continuing violation doctrine does not apply."); Garcia v. Centerpoint Energy Resources Corp., Civ. No. 10-54, 2012 WL 892278, at *2 (E.D. Ark. Mar. 15, 2012). Additionally, Plaintiff's claim related to the denial of his accommodation request in July 2016 is time-barred because the denial of an accommodation constitutes a separate, discrete act. See Ayala, 780 F.3d, at 57. Likewise, Plaintiff's claim relating to his alleged exclusion from Ms. Mata's staff meetings are also time-barred because an employee's exclusion from meetings is a discrete act. See Daly v. Citygroup, Inc., 939 F.3d 415, 429 (2d. Cir. 2019); Venti v. EDS, 236 F. Supp. 2d 264, 268-69 (W.D.N.Y. 2002).

Plaintiff's allegation related to the Sales Excellence Program is also time-barred. In the complaint, Plaintiff alleges that Ms. Mata appointed Mr. Capelli to be in charge of the Sales Excellence Program over him in order to protect Mr. Capelli from the reduction in force. ECF No. 1, at 9, ¶ 29; ECF No. 61-1, at 11-12, ¶ 27-31. The Sales Excellence Program was the name of DIRECTV's sales training program for Latin America, which under DIRECTV's structure

included Puerto Rico. ECF No. 68, at 37-38, ¶ 3; ECF No. 68-1, at 3, ¶ 11. The Sales Excellence Program was discontinued in 2015. Id.

Plaintiff has not contested that the Sales Excellence Program was discontinued in 2015. ECF No. 68, at 37-38, ¶ 3. Plaintiff has also not proffered evidence detailing when Mr. Capelli was assigned to the Sales Excellence Program or that it occurred on or after May 31, 2017. Therefore, Plaintiff's claims related to the Sales Excellence Program are time-barred because the denial of a promotion and denial of preferred job assignments constitute discrete acts. See Sirisena v. City Univ. of New York, Civ. No. 17-7135, 2019 WL 1493220, at *5 (E.D.N.Y. Mar. 31, 2019) ("denial of preferred job assignments is a prototypical example of a discrete act that is not subject to the continuing violation doctrine"); Shah v. Tunxis Cmty. College, Civ. No. 3:14–712, 2015 WL 4254909, at *7 (D. Conn. July 14, 2015); Anderson v. Nassau Cty. Dept. of Corr., 558 F. Supp. 2d 283, 297 (E.D.N.Y. 2008). Similarly, Plaintiff's claim related to the Compass program is also time-barred. Plaintiff received a written warning on March 10, 2017 regarding the January 9, 2017 meeting regarding the Compass program. A letter of warning constitutes a discrete act, and thus, this claim is time-barred. See Ayala, 780 F.3d, at 57.

Plaintiff's brief is silent regarding Defendant's allegations that he did not timely file an administrative charge for his ADEA and ADA claims arising from events prior to May 31, 2017. No evidence or argument has been proffered to demonstrate that the continuing violation doctrine applies to this case. Furthermore, "the court sees no basis for tolling the statute of limitations period in this case, nor do plaintiffs suggest as much." Martínez-Jordan, 608 F. Supp. 2d at 238. Consequently, Plaintiff's ADEA and ADA claims arising from events predating May 31, 2017 are time-barred. See id. ("Title VII's timeliness requirement is mandatory, and failure to file within the time period means a potential plaintiff 'lose[s] the ability to recover for [the

alleged discrimination].'" (quoting <u>Morgan</u>, 536 U.S. at 109-10)); <u>Vazquez-Robles v. CommoLoco, Inc.</u>, 186 F. Supp. 3d 138, 147 (D.P.R. 2016) (explaining that an ADA plaintiff must timely file an EEOC charge in Puerto Rico within 300 days of the alleged unlawful conduct and that "time-barred acts are not actionable.").

**2. Plaintiff's ADEA Claims for events that occurred on or after May 31, 2017**

The ADEA prohibits an employer from discharging or "otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of [his] age." 29 U.S.C. § 623(a)(1). Under the ADEA, "the plaintiff retains the burden of persuasion to establish that age was the "but-for" cause of the employer's adverse action." <u>Gross v. FBL Financial</u>, 557 U.S. 167 176-77 (2009); <u>see</u> <u>Rodríguez-Cardi v. MMM Holdings, Inc.</u>, 936 F.3d 40, 47 (1st Cir. 2019) ("the plaintiff bears the burden of proving that her age was the determinative factor in her discharge").

"Due to the difficulties of unmasking intentional discrimination, a task that has been described as 'elusive,' courts have crafted a burden-shifting framework to be used in cases where direct evidence of intentional discrimination is lacking. <u>Sánchez v. Puerto Rico Oil Co.</u>, 37 F.3d 712, 719 (1st Cir. 1994) (citations omitted). Where the plaintiff does not have direct evidence of discrimination, like the case at bar, the <u>McDonnell Douglas</u> burden-shifting framework is applied. <u>See</u> <u>Rodríguez-Cardi</u>, 936 F.3d at 47 (citing <u>McDonnell Douglas Corp v. Green</u>, 411 U.S. 792, 802-805 (1973)). Under the <u>McDonnell Douglas</u> framework, a plaintiff has the initial burden to set forth a prima facie case by showing that (1) he was at least forty years old at the time of his termination; (2) he was qualified for the position he held and was meeting the employer's reasonable expectations; (3) he was terminated from his employment; and (4) "the employer subsequently filled the position, demonstrating a continuing need for the plaintiff's

services." Id. (citing Vélez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 447-48 (1st Cir. 2009)).

"Once the plaintiff establishes [his] prima facie case, there is a rebuttable presumption of discrimination, and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for dismissing the employee." Del Valle-Santana v. Servicios Legales de Puerto Rico, Inc., 804 F.3d 127, 130 (1st Cir. 2015). "If the employer meets that burden, then the plaintiff, to survive summary judgment, must provide evidence from which a reasonable juror could find that 'the employer's proffered reason is actually a pretext for discrimination.'" Robinson v. Town of Marshfield, 950 F.3d 21, 25 (1st Cir. 2020) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991)). "To satisfy this burden with respect to pretext, the plaintiff must 'elucidate specific facts which would enable a jury to find that the reason given' by the defendant for the adverse employment action 'is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination.'" Id. (quoting Soto-Feliciano v. Villa Cofresi Hotels, Inc., 779 F.3d 19, 25 (1st Cir. 2015)).

### a) Plaintiff's Prima Facie Case of Age Discrimination

As stated earlier, Plaintiff did not timely file an administrative charge for his age discrimination claims arising from events that occurred prior to May 31, 2017. Defendant moves for summary judgment on Plaintiff's remaining ADEA claim that he was terminated because of his age. ECF No. 46, at 14-16. It is contended by Defendant that Plaintiff has not made a prima facie case of age discrimination because he cannot show there was a continued need for his services after his termination. Id. at 16. Defendant specifically argues that the Sales Training Manager position was eliminated as a result of the reduction in force. Id.

Plaintiff, on the other hand, claims that he satisfies the fourth element under the

McDonnell Douglas framework because he was replaced by Mr. Capelli, "a much younger and

less qualified employee who presently occupies exactly the same position that [Plaintiff]

occupied at the time AT&T alleges it was forced to eliminate." ECF No. 60, at 23. In the context

of a reduction in force, like the instant case, Plaintiff may satisfy the fourth requirement of his

prime facie burden by "showing that the employer either did not treat age neutrally or retained

younger employees in the same position." Otero v. Penney, Civ. No. 13-1467, 2015 WL 274171,

at *4 (D.P.R. Jan. 22, 2015); see also Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 n.4 (1st Cir.

2000). The First Circuit has held that

> [a] discharged employee is not replaced when another employee is assigned to
> perform the plaintiff's duties in addition to other duties, or when the work is
> redistributed among other existing employees already performing related work.
> Rather, a person is replaced only when another employee is hired or reassigned to
> perform the plaintiff's duties.

LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 846 (1st Cir. 1993) (citations omitted); see Pages-

Cahue v. Iberia Lineas Aereas de España, 82 F.3d 533, 539 (1st Cir. 1996) ("to reasonably infer

that Pages was replaced by a younger employee, we would have to conclude that Pages' duties,

and no others, were allocated to Alós ..."); Hoffman-García v. Metrohealth, Inc., Civ. No. 14-

1162, 2018 WL 67100, at *8 (D.P.R. Jan. 31, 2018) ("to reasonably infer that Hoffman was

replaced by Martínez to the point of having been effectively retained while Hoffman was not, the

record would have to show that Hoffman's duties, 'and no others,' were allocated to Martínez").

Plaintiff's argument that he was replaced by Mr. Capelli is unavailing. In his unsworn

declaration, Plaintiff states that "[i]ronically, in actuality [Mr. Capelli] presently occupies the

Senior Manager Training[,] the position I held prior to my termination and that AT&T/Ms. Mata

eliminated in the Puerto Rico [reduction in force]." ECF No. 61-1, at 11, ¶ 28. The uncontested

facts show that Mr. Capelli occupied the Training Specialist position until February 28, 2019. ECF No. 68, at 38, ¶ 4. On March 1, 2019, he was transferred to the Senior Training Mgr/Instructor position. Id.

In its reply to Plaintiff's opposition to motion for summary judgment, Defendant contends in its additional statement of facts that the Senior Training Mgr/Instructor position has different duties than the Sales Training Manager position and that it does not have supervisory responsibilities. ECF No. 68, at 38, ¶ 4; ECF No. 68-1, at 3, ¶ 12. In its sur reply, Plaintiff did not contest Defendant's assertion that the Senior Training Mgr/Instructor position and Sales Training Manager position have different duties. ECF No. 76. Plaintiff has also not proffered evidence nor explained how he knows that the Sales Training Manager position has exactly the same duties as the Senior Training Mgr/Instructor position. Because Plaintiff has not "pointed to the functional similarities in [his alleged] replacement's duties, his claim amounts to 'conclusory allegations, improbable inferences, and unsupported speculation.'" See Otero, 2015 WL 274171, at *5 (citations omitted). Furthermore, Plaintiff has not proffered evidence that Defendant did not treat age neutrally or that younger employees were retained over older employees during the reduction in force. "While the burden of establishing a prima facie case is not onerous, the plaintiff is still required to prove the prima facie elements by a 'preponderance of the evidence.'" Del Valle-Santana, 804 F.3d at 131.

Plaintiff has not satisfied the fourth element of his prima facie burden that Defendant had a continuing need for Plaintiff's services because he did not make the requisite showing that a younger employee was retained in the same position he held prior to his termination or that age was not treated neutrally in the reduction in force. Therefore, Plaintiff's claim of age discrimination under the ADEA fails at the prima facie stage.

**b) Defendant's Burden at Step Two of the <u>McDonnell Douglas</u> Framework**

Even assuming arguendo that Plaintiff satisfied the fourth criteria of a prima case of age discrimination, these claims would not survive the second and third steps of the <u>McDonnell Douglas</u> framework. "Once the elements of the first step have been met, the defendant has the burden to produce (articulate) — not prove — a legitimate, nondiscriminatory reason for the plaintiff's dismissal." <u>Albite v. Polytechnic Univ. of Puerto Rico, Inc.</u>, 5 F. Supp. 3d 191, 196-97 (D.P.R. 2014). In the case at bar, Defendant alleges that

> as a result of the elimination of DIRECTV's direct salesforce, the fact that AT&T Mobility would not sell DIRECTV's prepaid services, the consolidation of AT&T and DIRECTV's retail locations, the impact these decisions had on the size of DIRECTV's salesforce and DIRECTV prepaid sales, and the fact that AT&T Mobility already had a training team that would train its [retail sales consultants] to sell DIRECTV's services, the Decisional Unit decided that AT&T Mobility no longer needed a Sales Training Manager position in DIRECTV. Thus, the position was eliminated.

ECF No. 47, at 18, ¶ 81; ECF No. 47-1, at 5, ¶ 41. Defendant has satisfied its step two burden because its proffered reason that Plaintiff's employment was terminated due to the reduction in force within the context of a restructuring of its operations constitutes a legitimate, non-discriminatory reason for his termination. <u>See</u> <u>LeBlanc v. Great American Ins. Co.</u>, 6 F.3d 836, 844-45 (1st Cir. 1993).

**c) Plaintiff's Burden at Step Three of the <u>McDonnell Douglas</u> Framework**

Because Defendant articulated a non-discriminatory reason for Plaintiff's termination, the burden shifts back to Plaintiff to show that the legitimate reasons offered by Defendant were mere pretext, and "that the real motivation for his termination was age discrimination." <u>Pérez-Maspons v. Stewart Title Puerto Rico, Inc.</u>, 208 F. Supp. 3d 401, 416 (D.P.R. 2016) (citing <u>Meléndez v. Autogermana, Inc.</u>, 622 F.3d 46, 52 (1st Cir. 2010)). "To do so, Plaintiff must 'elucidate specific facts which would enable a jury to find that the reasons given is not only a

sham, but a sham intended to cover up the employer's real motive: age discrimination.'" Id.
(quoting Meléndez, 622 F.3d at 52).

As support for the inference of pretext, Plaintiff alleges that upon his return from medical
leave in April 2016 that he was demoted due to his age because he no longer supervised
Mr. Capelli and Mr. Lugo. ECF No. 60, at 27; ECF No. 61-1, at 6. It is also alleged by Plaintiff
that Ms. Mata stopped supervising him and excluded him from her staff meetings because of his
age. Id. Plaintiff asserts that "Ms. Mata and AT&T's alleged reasons for his otherwise illegal
firing are only a sham to cover up for the real discriminatory reasons. That is, that [Plaintiff's]
termination was without cause, repressive and discriminatory due to his age." Id. at 29; ECF No.
61-1, at 11-12, ¶¶ 27-31. Plaintiff, however, does not connect these events with any evidence of
discriminatory animus and instead relies upon conclusory allegations which are insufficient to
establish that Defendant's proffered reason was pretextual. Medina-Muñoz v. R.J. Reynolds
Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (The court may ignore "conclusory allegations,
improbable inferences, and unsupported speculation.").[6]

Plaintiff also argues that "AT&T's decision to terminate [him] was already taken as of
March 2017 long before the Decisional Unit in charge of [Ms. Mata] was assembled with the
task of implementing the reduction in force. Thus, [Plaintiff's] alleged termination as a result of
AT&T's reorganization is pretextual." ECF No. 60, at 29; ECF No. 61, at 18, ¶ 95; ECF No. 61-
3, at 3. Plaintiff supports his allegation with an Equal Employment Opportunity ("EEO") referral
regarding his March 2017 internal copyright infringement complaint. See ECF No. 61-3. The
EEO referral includes an "update" dated March 20, 2017 from Ms. Kimberly Hinshaw
("Ms. Hinshaw") that stated that she "[j]oined call with Legal Zahira Diaz and HRBP Ana

---

[6] If anything, the uncontroverted evidence shows that Plaintiff attended Ms. Mata's staff meetings only for two months in 2015 when the supervisory position between Plaintiff and Ms. Mata was vacant.

Figueroa Lorenzo to discuss complaint." ECF No. 61-3, at 3, ¶ 2. Ms. Hinshaw also noted, in pertinent part, that "Ana then brought up as an FYI that [Plaintiff] is on an upcoming surplus because his position is being eliminated." Id.

Plaintiff's argument fails to provide evidence for a reasonable jury to conclude that the reduction in force was pretextual. Defendant admits that the Sales Training Manager position that Plaintiff occupied was included in a preliminary list of positions that would be eliminated in an upcoming reduction in force and that the position had already been on this preliminary list as of March 17, 2017. ECF No. 68, at 36, ¶ 95. Defendant, however, denies Plaintiff's remaining allegations.

Plaintiff's claim that Ms. Mata was in charge of the Decisional Unit is not supported by his record citations. Furthermore, Plaintiff has not cited to any evidence to support his argument that the decision to terminate him happened as early as March 2017 before the Decisional Unit made its recommendations regarding the reduction in force. The Decisional Unit adopted London Consulting's recommendations in July 2017. ECF No. 68-1, at 2, ¶ 9. The mere fact that Plaintiff is referenced as being on a surplus list in March 2017 is insufficient by itself to establish that Defendant's proffered reason for his termination was pretextual and that the real reason was discriminatory animus, particularly taking into account that it is uncontested that in 2015 London Consulting recommended the elimination of Plaintiff's position. Plaintiff has neither established the prima facie case for age discrimination nor presented sufficient evidence that Defendant's proffered reason was pretextual for age discrimination. Therefore, Plaintiff's ADEA age discrimination claims are DISMISSED WITH PREJUDICE.

### 3. Plaintiff's ADA Claims for events that occurred on or after May 31, 2017

"The ADA forbids employers from terminating the employment of a qualified individual on the basis of disability." Pena v. Honeywell Int'l, 923 F.3d 18, 27 (1st Cir. 2019) (citing 42

U.S.C. § 12112(a)). As stated earlier, a claimant under the ADA must exhaust the administrative remedies under Title VII as a perquisite to filing suit in court. See Mercado v. Walmart Puerto Rico, Inc., 369 F. Supp. 3d 336, 349 (D.P.R. 2019). "An ADA claimant must file an administrative claim within 180 days if submitted before the EEOC, or within 300 days if presented before a state agency with jurisdiction to receive such claims." Id. "Since Puerto Rico is a 'deferral' jurisdiction for purposes of the filing of an administrative charge under Title VII, a person aggrieved has 300 days to file an administrative charge, pursuant to 42 U.S.C. § 2000e–5(e)." Rodríguez v. Santiago, 11 F. Supp. 3d 37, 44 (D.P.R. 2014). Plaintiff's allegations of disability discrimination arising from events prior to May 31, 2017 are time-barred because an administrative charge was not filed until March 27, 2018. Thus, it follows that Plaintiff's claim that Defendant discriminated against him when it denied his reasonable accommodation request in July 2016 is time-barred. See Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009) (explaining that the denial of an employee's request for accommodation is a discrete act).

Plaintiff's only remaining ADA claim that is not time-barred is his claim that he was terminated because of his disability. ECF No. 60, at 14-18. Where the plaintiff does not have direct evidence of discriminatory animus, like the case at hand, the McDonnell Douglas burden-shifting framework is applied. See Flaherty v. Entergy Nuclear Operations, 946 F.3d 41, 53-54 (1st Cir. 2019). "Under the McDonnell Douglas framework, a plaintiff alleging an ADA claim for discriminatory firing has the initial burden of establishing a prima facie case by showing that he (1) was disabled within the meaning of the ADA, (2) was a qualified individual, and (3) was discharged in whole or in part because of his disability." Id. (citations omitted).

"If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to 'articulate a legitimate, non-discriminatory reason for its employment decision and to produce

credible evidence to show that the reason advanced was the real reason.'" Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 99 (1st Cir. 2007) (quoting Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 105 (1st Cir. 2005)). If the defendant meets its burden, "the burden shifts back to the plaintiff to 'proffer evidence to establish that [the defendant's] non-discriminatory justification is mere pretext, cloaking discriminatory animus.'" Id.

### a) Plaintiff's Prima Facie Case of Disability Discrimination

"An individual is disabled for purposes of the ADA if he (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." Román-Oliveras v. Puerto Rico, Elec. Power Auth., 655 F.3d 43, 48 (1st Cir. 2011); see 42 U.S.C. § 12102(1). The EEOC defines physical impairment as, "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1).

In the case at bar, Plaintiff argues that he qualifies as disabled under the ADA by virtue of his status as a liver transplant patient. ECF No. 60, at 18. Plaintiff's status as a liver transplant patient, however, does not equate with disability. To satisfy the first category of disability, a plaintiff must demonstrate that he has a physical or mental impairment that substantially limits one or more major life activities. [7] See Román-Oliveras, 655 F.3d at 48. Here, Plaintiff has not

---

[7] "Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "[A] major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." Id. at § 12102(2)(B).

presented any evidence one or more of his major life activities has been substantially limited. Even assuming arguendo that Plaintiff had presented evidence that his liver transplant impacted his liver function, that would still be insufficient to establish he is disabled because liver function is not a major life activity under the ADA. See Furnish v. SVI Sys., Inc., 270 F.3d 445, 450 (7th Cir. 2001) (holding that liver function "is not a major life activity under the ADA, plaintiff is not disabled and cannot prevail on his ADA claim."). Plaintiff does not satisfy the first category of disability because he did not proffer evidence that a major life activity was substantially limited.

Plaintiff has also not established that he satisfies the second category of disability which includes individuals who have a record or history of a disability that substantially limited one or more major life activities but who may no longer have a disability at present. See Castro-Medina v. Procter & Gamble, 565 F. Supp. 2d 343, 364 (D.P.R. 2008) (citing 42 U.S.C. § 12102(2)(B)). Plaintiff has not adduced to any record indicating that his status as a liver transplant patient substantially limited any major life activity.

Lastly, Plaintiff asserts that he meets the third category of disability because Defendant "regarded him as being disabled." ECF No. 60, at 18. "To establish a prima facie 'regarded as' claim under the McDonnell Douglas framework, a plaintiff must show, as relevant here, that he had an actual or perceived impairment and that his employer was either aware of or perceived the impairment at the time of the allegedly discriminatory action." Mancini v. City of Providence, 909 F.3d 32, 46 (1st Cir. 2018). "The requirements for a prima facie 'regarded as' claim are less demanding than those for either an 'actual disability' or 'record of disability'" claim because a plaintiff does not need to show that that the impairment limits or is perceived to limit a major life activity. Id. Plaintiff alleges that Defendant regarded him as disabled because "AT&T knew or had reason to know of [Plaintiff's] disability firstly [sic] because [Plaintiff] himself told the HR

Department, was granted medical leave for liver transplant surgery, the employer's medical plan covered his medical costs in excess of $1,000,000.00 and [Plaintiff] himself requested reasonable accommodation under ADA." ECF No. 60, at 18.

The first issue in determining whether Plaintiff satisfies the "regarded as" prong is whether Plaintiff's status as a liver transplant patient constitutes a physical impairment under the ADA. Absent from the record is any medical evidence or professional medical opinions about Plaintiff's unidentified "life threatening condition" and corresponding impairments. Nonetheless, despite the deficiencies in Plaintiff's argument, it is plausible that Plaintiff's status as a liver transplant patient qualifies as a physical impairment even after surgery has been completed. See Jackson v. Serv. Eng'r, 96 F. Supp. 873, 881 (S.D. Ind. 2000) (finding that the "regarded as" prong was satisfied where employer knew that plaintiff's wife's liver disease was life threatening, she required a liver transplant, and was aware of the medical costs of her treatment). In the case at bar, Defendant had knowledge that Plaintiff was a liver transplant patient at the time of Plaintiff's termination in December 30, 2017 because Plaintiff had requested and been granted medical leave for a liver transplant beginning in August 2015. ECF No. 47, at 9, ¶ 42. Defendant was also aware that Plaintiff requested an accommodation consisting of time off to attend medical appointments and checkups related to his liver transplant. Id. at 10, ¶ 50. Therefore, because Defendant was aware of Plaintiff's liver transplant at the time of his termination, Plaintiff has carried his burden of establishing that he was disabled under the "regarded as" category.

Having satisfied the first element of his prima facie burden, Plaintiff is required to show that he was qualified for the Sales Training Manager position. Under the ADA, a plaintiff is a qualified individual if, with or without a reasonable accommodation, he can "perform the

essential functions of the employment position." 42 U.S.C. § 12111(8); see Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 75 (1st Cir. 2010). Plaintiff's employment with DIRECTV began in March 2013. After DIRECTV became a wholly owned subsidiary of AT&T, Inc., Plaintiff became an employee of AT&T Mobility and worked until his termination in December 2017. Throughout his tenure, Plaintiff was employed in a supervisory role and received periodic merit increases in compensation. ECF No. 47, at 2-3, ¶¶ 10, 15. The duration of his employment and his supervisory position suggests that he possessed the requisite qualifications and experience to serve as Sales Training Manager. See Arroyo-Ruiz v. Triple-S Mgmt. Grp., 206 F. Supp. 3d 701, 714 (D.P.R. 2016). Thus, Plaintiff was qualified for the Sales Training Manager position.

As the final part of his prima facie burden of his disability discrimination claim, Plaintiff is required to show that Defendant took adverse action against him, in whole, or in part, because of his disability. Id. at 715 (citing Roman-Olivares v. Puerto Rico Elec. Power Authority, 655 F.3d 43, 48 (1st Cir. 2011)). At this third prong, Plaintiff "must proffer sufficient evidence that his employer [was] motivated by discriminatory animus." Rivera-García v. Ana G. Mendez Univ. Sys., 359 F. Supp. 2d 58, 61 (D.P.R. 2005). In the case at hand, Plaintiff argues that he was terminated because Defendant was fearful that he would need another costly liver transplant in the future. See ECF No. 60, at 5. Plaintiff also claims that he was subject to several discriminatory acts which show that he was terminated for discriminatory reasons. It is alleged by Plaintiff that Ms. Mata excluded him from her staff meetings and that she preferred working with the younger staff. See ECF No. 61-1, at 4, ¶ 12, at 8, ¶ 21. Additionally, Plaintiff alleges that he was demoted in April 2016 when he returned from medical leave because Ms. Rodríguez

treated him like a Training Specialist and he no longer supervised Mr. Capelli and Mr. Lugo. See ECF No. 61-1, at 4, ¶ 12, at 6, ¶¶ 16-18.

Plaintiff's arguments do not hold water. First, Plaintiff's claim that he was terminated because Defendant was fearful of another costly liver transplant is unfounded because it is not substantiated by any evidence. While Plaintiff contends that the cost of his medical treatment related to his liver transplant exceeded $1,000,000, he has not cited to any evidence to support his assertion that Defendant was fearful that Plaintiff would require another liver transplant. ECF No. 60, at 5; ECF No. 61-1, at 5, ¶ 15. Nor does Plaintiff cite to any evidence that Defendant considered Plaintiff's healthcare costs in his termination. See Gaglioti v. Levin Group, Inc., 508 Fed. Appx. 476, 484-85 (6th Cir. 2012) (granting summary judgment for employer on ADA claim where no evidence was presented that employer was concerned about healthcare expenses); Dodson v. Coatesville, Civ. No. 16-5857, 2018 WL 4007083, at *7 (E.D. Penn. Aug. 21, 2018) (granting summary judgment for employer where plaintiff did not satisfy the prima facie burden of her ADA claim because there was no evidence that the cost of her husband's medical care affected the employer's decision to include plaintiff in an eight-person layoff); White v. Carmeuse Lime & Stone, Inc., Civ. No. 9-265, 2011 WL 3585064, at *8-9 (W.D. Mich. May 31, 2011) (finding that plaintiff did not satisfy his prima facie burden of his ADA claim where he contended that he was terminated due to healthcare costs, but presented no evidence that management was concerned about those expenses). But see Trujillo v. PacifiCorp, 524 F.3d 1149, 1157 (10th Cir. 2008) (finding that ADA plaintiff satisfied prima facie burden where she presented evidence of concerns by management "about rising healthcare costs, numerous efforts to cut those costs, corporate monitoring of general healthcare costs and of [the plaintiffs' son's] claims specifically.").

While very close temporal proximity may give rise to an inference of causation, the facts in the case at hand do not give rise to such an inference. See Calero–Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004). Plaintiff began his SINOT leave on September 30, 2015. ECF No. 47, at 9, ¶ 43. On January 29, 2016, Plaintiff underwent a liver transplant. ECF No. 47, at 9, ¶ 44. Plaintiff returned to work on April 4, 2016. ECF No. 47, at 10, ¶ 49. On July 31, 2017, Plaintiff received the surplus notification letter and his last day of employment was on December 30, 2017. ECF No. 47, at 19, ¶ 83; ECF No. 47, at 20, ¶ 90. The over one year that elapsed between Plaintiff's return from SINOT leave and his surplus notification letter is insufficient to give rise to an inference that Defendant's actions were fostered by disability-based animus. See Calero-Cerezo, 355 F.3d at 25 (noting that "[t]hree and four month periods have been held insufficient to establish a causal connection based on temporal proximity."); Natal Pérez v. Oriental Bank & Trust, 291 F. Supp. 215, 236 (D.P.R. 2018) (explaining that a six-month gap "is too long to prove causation by temporal proximity."); Arroyo-Ruiz v. Triple-S Mgmt. Grp., 206 F. Supp. 3d 701, 717 (D.P.R. 2016) (finding that the nine-month period between the protected conduct and the adverse action cannot satisfy the causation prong of an ADA claim).

While Plaintiff alleges that he was terminated due to his liver transplant, he has not provided any non-conclusory evidence that his termination was "fostered by disability-based animus." See Montanez v. Educ. Tech. College, 660 F. Supp. 2d 235, 240 (D.P.R. 2009). Plaintiff has not established a plausible nexus between his disability and termination, and thus, he has failed to carry his prima facie burden of disability discrimination under the McDonnell Douglas framework.

**b) Defendant's Burden at Step Two of the <u>McDonnell Douglas</u> Framework**

Even assuming arguendo that Plaintiff has satisfied his prima facie burden, which is not the case here, Defendant has put forward a legitimate, non-discriminatory reasons for Plaintiff's termination. <u>See</u> <u>Flaherty</u>, 946 F.3d at 53-54. As stated earlier, Defendant has asserted that it no longer had a need for the Sales Training Manager position and that Plaintiff's termination was the result of the reduction in force that happened because of a restructuring in operations, which is a legitimate reason for his termination. ECF No. 47, at 18, ¶ 81; <u>see</u> <u>LeBlanc v. Great American Ins. Co.</u>, 6 F.3d 836, 844-45 (1st Cir. 1993).

**c) Plaintiff's Burden at Step Three of the <u>McDonnell Douglas</u> Framework**

Because Defendant offered a legitimate non-discriminatory reason for Plaintiff's dismissal, the burden shifts back to Plaintiff to show that Defendant's justification—the reduction in force due to a restructuring of operations—was a pretext for discrimination. <u>See</u> <u>Freadman v. Metro. Prop. & Cas. Ins. Co.</u>, 484 F.3d 91, 99 (1st Cir. 2007). It is alleged by Plaintiff that his termination was pretextual because Ms. Mata assigned Mr. Capelli to be in charge of the Sales Excellence Program over him to protect Mr. Capelli from the impending reduction in force and that Mr. Capelli presently occupies the Sales Training Manager position. ECF No. 61-1, at 11, ¶ 27-28. Furthermore, Plaintiff claims that his position "was disguised temporarily until [Mr. Capelli] was able to assume it . . ." ECF No. 60, at 18.

Plaintiff's arguments fail to show that Defendant's legitimate proffered reason for his termination was a pretext for discrimination. Plaintiff's claim that Mr. Capelli was assigned to the Sales Excellence Program to be shielded from the reduction in force is baseless because Plaintiff has not cited to any non-conclusory record evidence in support of his claim. Similarly, Plaintiff's allegation that his position was "disguised temporarily" until it could be assumed by

Mr. Capelli is also unsubstantiated because Plaintiff has not supported his allegation with record

citations. Mr. Capelli occupied the Training Specialist position until February 28, 2019. On

March 1, 2019, Mr. Capelli was transferred to the Senior Training Mgr/Instructor position.

Plaintiff has not provided any evidence that the Sales Training Manager position that he

occupied prior to his termination is the same position as the Senior Training Mgr/Instructor

position with the same duties. Plaintiff has neither established the prima facie case for disability

discrimination nor presented sufficient evidence that Defendant's proffered non-discriminatory

reason for his termination was pretext for disability discrimination. Thus, Plaintiff's ADA

disability discrimination claims are DISMISSED WITH PREJUDICE.

### 4. Plaintiff's Title VII Claims

Defendant alleges that Plaintiff does not have an actionable claim under Title VII because

he has not alleged that he was discriminated against for any of the characteristics protected by

Title VII. ECF No. 46, at 2. "Title VII makes it 'an unlawful employment practice for an

employer . . . to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or

national origin.'" Rodríguez v. Dep't of Army, Civ. No. 16-1000, 2018 WL 4638216, at *3

(D.P.R. Sept. 24, 2018) (quoting Vance v. Ball State Univ., 570 U.S. 421, 426 (2013)); see 42

U.S.C. § 2000e–2(a)(1). "The anti-retaliation provision of Title VII makes it unlawful to

discriminate against an employee 'because he has opposed any practice made an unlawful

employment practice by this subchapter, or because he has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under this subchapter.'"

Moreta v. First Transit of PR, Inc., 39 F. Supp. 169, 178 (D.P.R. 2014) (citing 42 U.S.C.

§ 2000e–3(a)); see DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008).

In the case at bar, Plaintiff has not shown that he engaged in conduct protected by Title VII. Nowhere in his complaint or brief in opposition to the motion for summary judgment does Plaintiff allege that he was subject to discrimination based on anything other than his age or disability. Title VII does not apply to claims of age or disability discrimination. See Salamo Martínez v. Celulares Telefonica, Inc., 272 F. Supp. 144, 152 (D.P.R. 2003) ("It is clear that Title VII does not apply to discrimination on the basis of age."); Rodríguez, 2018 WL 4638216, at *3 ("Title VII does not protect disabled individuals from discrimination in employment."). Plaintiff does not have an actionable retaliation claim under Title VII because he has not presented any allegations or evidence that he was discriminated against because of race, sex, color, religion, or national origin. Therefore, Plaintiff's claim of retaliation under Title VII is DISMISSED WITH PREJUDICE.

**B. Puerto Rico Law Claims**

**1. Plaintiff's Puerto Rico Law 100 Claims**

Law 100 is Puerto Rico's general employment discrimination statute that seeks to prevent discrimination in employment by reason of age, race, color, religion, sex, social or national origin or social condition. See 29 L.P.R.A. § 146; Ramos v. Toperbee Corp., 241 F. Supp. 3d 305, 337 (D.P.R. 2017). "As applied to age discrimination, it differs from the ADEA only with respect to how the burden-shifting framework operates." Dávila v. Corporacion de Puerto Rico Para La Difusion Publica, 498 F.3d 9, 18 (1st Cir. 2007). Under Law 100,

> a plaintiff has the initial burden to establish a prima facie case by (1) demonstrating that he was actually or constructively discharged, and (2) alleging that the decision was discriminatory. Having met this rather undemanding requirement, the burden of persuasion shifts to the employer to show, by a preponderance of the evidence, that it had good cause for its action. If the employer shows good cause, then, as under the ADEA, the burden of persuasion returns to the employee to show that the employer's decision was motivated by age discrimination.

Velázquez-Fernández v. NCE Foods, Inc., 476 F.3d 6, 11 (1st Cir. 2007) (citations omitted).

A one-year statute of limitations applies to Law 100 claims. Vargas v. Fuller Brush Co. of Puerto Rico, 336 F. Supp. 2d 134, 143 (D.P.R. 2004). A cause of action under Law 100 accrues on the date that the employee becomes aware of the adverse personnel action and the statute of limitations may be tolled upon the filing of a discrimination charge with the EEOC or the Puerto Rico ADU. See Oquendo v. Costco Wholesale Corp., Civ. No. 17-2238, 2020 WL 16918991, at *16 (D.P.R. Apr. 7, 2020). In the case at bar, Plaintiff was terminated in December 30, 2017, he filed an administrative charge on March 27, 2018, and he received the right to sue on October 2, 2018. ECF No. 1, at 2-3, ¶ 4; ECF No. 12, at 2, ¶ 4; ECF No. 47, at 20, ¶ 90. Plaintiff filed the complaint on October 16, 2018. ECF No. 1. Therefore, Plaintiff's only Law 100 claim that is not time-barred is his allegation that he was terminated because of his age.

"As to the merits of the claims asserted under Law 100 and ADEA, the First Circuit has stated the following: 'We need not wax longiloquent. On the merits, age discrimination claims asserted under the ADEA and under Law 100 are coterminous.'" Torres-Alman v. Verizon Wireless Puerto Rico, Inc., 522 F. Supp. 2d 367, 402 (1st Cir. 2007) (quoting Dávila, 498 F.3d at 18); see also González v. El Dia, Inc., 304 F.3d 63, 73 n.7 (1st Cir. 2002); Ramos v. Toperbee Corporation, 241 F. Supp. 3d 305, 337 (D.P.R. 2017). As discussed earlier for Plaintiff's ADEA claim, Plaintiff has adduced "no significantly probative evidence that his discharge was motivated by age." See Dávila, 498 F.3d at 18. Accordingly, Plaintiff's Puerto Rico Law 100 claims are DISMISSED WITH PREJUDICE.

## 2. Plaintiff's Puerto Rico Law 44 Claims

Law 44 is Puerto Rico's counterpart to the ADA and prohibits discrimination against disabled individuals. See Aguirre v. Mayaguez Resort and Casino, Inc., 59 F. Supp. 340, 348

(D.P.R. 2014); 1 L.P.R.A. § 501. A one-year statute of limitations applies to Law 44 claims, but it may be tolled upon the filing of an administrative charge with the Puerto Rico ADU. See Vázquez Robles v. CommoLoCo, Inc., 252 F. F. Supp. 3d 111, 114 (D.P.R. 2017).

As stated earlier, Plaintiff was terminated on December 30, 2017, he filed an administrative charge on March 27, 2018, and he received the right to sue on October 2, 2018. ECF No. 1, at 2-3, ¶ 4; ECF No. 12, at 2, ¶ 4; ECF No. 47, at 20, ¶ 90. Plaintiff filed the complaint on October 16, 2018. ECF No. 1. Thus, it follows that Plaintiff's only Law 44 claim that is not time-barred is his allegation that he was terminated because of his alleged disability. As to the merits, Law 44 was "intended to harmonize Puerto Rico law with the federal statutory provisions of the ADA." Torres-Alman v. Verizon Wireless, 522 F. Supp. 2d 367, 401 (D.P.R. 2007). Accordingly, "the elements of proof for a claim under Law 44 are essentially the same as for a claim under the ADA." Id. The First Circuit has found that claims of discrimination under Puerto Rico Law 44 are coterminous with ADA claims. See Ruiz Rivera v. Pfizer, 521 F.3d 76, 87 (1st Cir. 2008); Gonzalez v. El Dia, Inc., 304 F.3d 63, 74 n.8 (1st Cir. 2002). Accordingly, having determined that Plaintiff has no valid claims under the ADA, Plaintiff's Puerto Rico Law 44 claims are DISMISSED WITH PREJUDICE.

### 3. Plaintiff's Puerto Rico Law 115 Claims

Plaintiff also brings claims against Defendant under Puerto Rico Law 115 which

makes it unlawful for the employer to discharge, threaten, or discriminate against an employee regarding terms, conditions, compensation, location, benefits or privileges of employment should the employee offer or attempt to offer any testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico.

Oquendo v. Costco Wholehouse Corp., Civ. No. 17-2238, 2020 WL 1698991, at *19 (D.P.R. Apr. 7, 2020); 29 L.P.R.A. § 194(a). A three-year statute of limitations applies to Law 115 claims. See 29 L.P.R.A. § 194a(b).

"Federal courts . . . have consistently treated a claim under Law 115 the same as a claim pursuant to Title VII's antiretaliation provision." Wirshing v. Banco Santander de Puerto Rico, 254 F. Supp. 3d 271, 277 (D.P.R. 2015). A Puerto Rico Law 115 claim is analyzed under a burden shifting framework. "The employee must prove the violation through direct or circumstantial evidence that he participated in a protected activity and was subsequently discharged, threatened or discriminated against in his employment. Once done, the employer must provide a nondiscriminatory legitimate reason for the discharge, wherein the plaintiff must prove said reason is pretextual." Tirado Gonzalez v. Wendco of Puerto Rico, Inc., Civ. No. 14-1316, 2018 WL 377262, at *8 (D.P.R. Jan. 10, 2018); see 20 L.P.R.A. § 194a(c).

Plaintiff's motion in opposition to the motion for summary judgment is silent regarding his Puerto Rico Law 115 claims. Plaintiff does not set forth any argument, as was his burden, to show that he engaged in an activity protected by Law 115. Plaintiff's internal complaints that he filed on March 15, 2017 and March 21, 2017 regarding copyright violations and Ms. Rodríguez's alleged retaliation in the form of a written warning are not activities protected by Law 115. See Villanueva-Batista v. Doral Fin. Corp., 357 Fed. Appx. 304, 306 (1st Cir. 2009) ("Law No. 115 protects only 'testimony, expression or information ... before a legislative, administrative, or judicial forum,' not internal complaints."); Lupu v. Wyndham El Conquistador Resort and Golden Door Spa, 524 F.3d 312, 313 (1st Cir. 2008) (finding that plaintiff's Law 115 claims failed where he "never offered or attempted to offer any information to the Puerto Rico governmental authorities listed in the statute; nor had he threatened to go to such authorities.");

Colón-Diaz v. Dep't of Educ., Civ. No. 9-1564, 2010 WL 11679378, at *7 (D.P.R. June 8, 2010) (explaining that "while filing an EEOC charge qualifies as a protected activity, Law 115 does not prohibit retaliation in response to internal complaints.")

Even assuming that Plaintiff's internal complaints constituted protected activities, his claims under Law 115 must fail. As stated earlier, Defendant has articulated a legitimate nondiscriminatory reason that Plaintiff's Sales Training Manager position was eliminated due to a reduction in force. ECF No. 47, at 18, ¶ 81; ECF No. 47-1, at 5, ¶ 41. Plaintiff has failed to show that Defendant's proffered reason was pretextual, dooming his Law 115 claims. See Salgado-Candelario v. Ericsson Caribbean, Inc., 614 F. Supp. 2d 151, 177 (D.P.R. 2008). Therefore, Plaintiff's Puerto Rico Law 115 claims are DISMISSED WITH PREJUDICE.

### 4.  Plaintiff's Puerto Rico Article 1802 and Law 80 Claims

Defendant moves for summary judgment on Plaintiff's remaining Article 1802 and Law 80 claims which are grounded in Puerto Rico law. ECF No. 46, at 26-30, 35-36. Plaintiff's response and surreply are silent on these claims. "A district court retains the discretion, however, to decline to exercise supplemental jurisdiction where the district court has dismissed all claims over which it had original jurisdiction." Marrero–Gutierrez v. Molina, 491 F.3d 1, 7 (1st Cir. 2007) (citing 28 U.S.C. § 1367(c)(3)). Having dismissed all federal law claims and their Puerto Rico law counterparts, the court will not exercise supplemental jurisdiction over Plaintiff's Article 1802 and Law 80 claims arising from Puerto Rico law. Therefore, Plaintiff's Puerto Rico Article 1802 and Law 80 claims are DISMISSED WITHOUT PREJUDICE.

## V.   Conclusion

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 46) is GRANTED IN PART AND DENIED IN PART. Accordingly, Plaintiff's federal law claims

pursuant to the ADEA, ADA, and Title VII are hereby DISMISSED WITH PREJUDICE. Plaintiff's Puerto Rico law claims under Law 100, Law 44, and Law 115 are also DISMISSED WITH PREJUDICE. Having declined to exercise supplemental jurisdiction over Plaintiff's Puerto Rico Article 1802 and Law 80 claims, these claims are DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 4th day of September, 2020.

s/Marcos E. López
U.S. Magistrate Judge